Filed 8/7/26  P. v. Sanders CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DARIEN XAVIER SANDERS,<br><br>        Defendant and Appellant. | A170791<br><br>(Lake County<br>Super. Ct. No. CR957990) |

Trial counsel for appellant Darien Xavier Sanders set, and later withdrew, a motion to exclude a recording of his custodial interrogation.  On this appeal, Sanders contends the decision to withdraw the motion constituted ineffective assistance of counsel and requires reversal of his convictions.  Finding no constitutional violation, we affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

An information charged Sanders with various sex offenses committed in 2013 against his seven-year-old cousin, D.V.  Counts One through Four alleged that Sanders committed lewd and lascivious acts upon a child under the age of 14.  (Pen. Code § 288, subd. (a).)[1]  Count Five alleged an attempt to

---

[1] Undesignated statutory references are to the Penal Code.  We identify the victim and her mother by initials to protect the personal privacy interests of the victim.  (Cal. Rules of Court, rules 8.90(b)(4), (11).)

commit a violation of section 288, subdivision (a), by use of force, violence, duress, menace, or threat of great bodily harm. (§§ 664/288, subd. (b).) Count Six accused Sanders of an act of sexual penetration upon the same victim against her will. (§ 289, subd. (a)(1)(b).) Additionally, the information alleged multiple aggravating circumstances. (Cal. Rules of Court, rule 4.421(a)(3), (6), (11).)

Sanders requested a court trial and filed a motion to exclude self-incriminating statements he made during a custodial interrogation. The motion argued his statements were involuntary and made under circumstances that cast doubt upon their reliability. Sanders also moved to exclude evidence of any uncharged "moral misconduct" in response to comments Sanders made at the end of the interrogation that involved a person other than D.V. After the prosecutor's opening statement, defense counsel informed the court he "may be asking to exclude" Sanders's post-*Miranda* statements, but the motion could be considered by the court "in the course of the trial when the evidence is received."

### A. Trial Evidence

#### 1. The Victim Testifies that Sanders Abused Her

D.V. was 18 years old at the time of her trial testimony in 2024.

During the summer of 2013 when she was seven years old, her cousin Sanders spent two months living on a property shared by their family members. There were two homes on the property. She lived in one with her mother, stepfather, and sister. The other home, where Sanders stayed, was occupied by her grandparents and Sanders's father. D.V. and Sanders would hang out during the day. About three to four weeks after his arrival, he started tickling her in a way that felt playful. One week later, the tickling progressed to fondling and petting.

2

One day, when D.V. approached Sanders to show him a YouTube video, Sanders said he would let her show it to him if she let him touch her vagina. He did not use the word "vagina" but moved his hand towards D.V.'s vagina in a way that suggested he wanted to touch her there. Sanders touched D.V. for several minutes under her short pants and over her underwear. After that, each time they were alone, Sanders would put his hands down her pants.

A few days later, Sanders touched D.V.'s vagina again in the same manner. When their grandmother walked by, D.V. pushed his hand away. She knew Sanders would get in trouble for touching her. At the time, she wanted to protect him.

Other incidents followed. A touching occurred when she and Sanders watched an anime show called "*Lucky Star*." Sanders rubbed her vagina over her underwear for three to four minutes. Another time at her grandmother's house, while touching her vagina, Sanders asked if she wanted to touch him and pulled her hand toward his crotch. D.V. said, " '[n]o' " and pulled away. Later, in her parents' above-ground pool, Sanders grabbed D.V. as she tried to leave and pulled her so that she faced away from him. He put his hand underneath her bikini bottoms and touched her on the outside and inside of her vagina. After a few minutes, he let her go and left. D.V. felt scared and as if she had gone "into shock." She testified that whenever Sanders touched her, she would "go into [her] head" and "try not to think about what was happening." She would just sit there and wait until it was over.

Initially, when he started touching her, Sanders asked permission to do so. As time went on, he stopped asking. Sanders would touch her every time they were alone without seeking permission or even speaking to her. After the pool incident, Sanders attempted to touch her once more as they sat on a

couch, but D.V. pushed his hand away.[2]  Sanders asked if she wanted him to get in trouble and that if she didn't want him to get in trouble, she could not tell anyone, including her parents.

A few years later, while watching a television show about a girl who had been sexually assaulted, D.V.'s mother asked if anything like that ever happened to her.  D.V. disclosed that Sanders had touched her.

### 2. Police Testimony

As part of the investigation into D.V.'s allegations, Clearlake Police Detective Leonardo Flores interviewed Sanders at the county jail.  After being advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), Sanders spoke with the detective.[3]  The interview was recorded.

Detective Flores testified that, during the interview, Sanders was dressed in a "greenish garment" the jail gives to people who are possibly suicidal or want to hurt themselves.  Sanders appeared nervous at the interview but not agitated.[4]

### 3. The Jailhouse Interrogation

The recording of Sanders's interview was admitted into evidence subject to a motion to strike and played in court.  Sanders was 27 years old at

---

[2] This incident was not charged against Sanders.

[3] The detective informed Sanders he had "the right to remain silent. Anything you say may be used against you in a court of law [¶] . . . [¶] You have the right to the presence of an attorney before and during any questioning. If you cannot afford an attorney, one will be appointed, free of charge, before any questioning, if you wish.  Do you understand your rights?" Sanders replied, "Yes."

[4] After the detective completed his testimony, the prosecutor asked if the detective was dismissed.  Defense counsel responded, "I don't think I need to ask him anything. But there's a potential motion to strike; so I may seek to recall [the detective]."

4

the time of the interview. As this appeal challenges the voluntariness of this statement, we summarize the contents of the interrogation in some detail.

Early in the exchange, Sanders said he was trying not to tear up, and his heart was beating fast because he had been told he was being charged with pedophilia. His "mind was blown" upon hearing the accusation. When asked who he thought it might involve, Sanders said he hadn't asked who made the accusation. Detective Flores informed Sanders that he was there to talk about D.V.

Sanders acknowledged he had visited his father and grandparents for a few months when he was about 19 years old. During that time, he did not interact much with his "ex-cousin," D.V. He played video games, watched YouTube, and spent time with his father. Detective Flores revealed that D.V. had "disclosed some stuff," and asked Sanders, "[w]hat happened between you guys [¶] . . . [¶] [a] couple . . . times, she said . . . what do you think she said?" Sanders replied, "[H]onestly, I have no idea what she said." The detective then told Sanders, "this is the time where you . . . to make a wrong . . . correct." Detective Flores expressed that he thought Sanders was trustworthy, and that "it's your family member . . . maybe . . . all she wants is an apology." Next, the detective shared that D.V. claimed that Sanders "touched her in her private parts."

The detective continued: "I just want you to be honest with me . . . you say you're a terrible liar and . . . you wanna let it out. I just want you to tell me the truth. Maybe it was an accident . . . maybe she flirted with you." Sanders replied that, back then, he didn't know how to flirt because he didn't socialize. He claimed to know how it feels to fall in love but denied having feelings for D.V. Sanders said, ". . . I never touched [D.V.] there. Maybe on her stomach [¶] . . . [¶] I'm gonna say near close to there where she might

5

have thought I was gonna touch there, but honestly, I wouldn't go there." "I will be honest. I did not touch her vagina. I have touched just right just above it, so like underneath her, underneath her stomach just right above it . . . but nothing between us sexually . . . ."

The detective claimed D.V. reported that Sanders touched her several times. The detective added, "this is like a family member and your mom is awfully concerned. You care about your mom . . . ." Sanders denied touching D.V., saying he "never did." He denied any touching incident at the pool but said he liked to swim in circles and there "might've been points where [he was] close to [D.V.] where [his] hand just rubbed against her and stuff like that, but [he] never intentionally tried to touch her like that." Sanders also denied agreeing to watch a video with D.V. only if she allowed him to touch her. Sanders stated he would not have done that because he knew she was underage.

Detective Flores said he had done a lot of interviews like this where people said they made a mistake. Then he told Sanders that this is where he has to tell him if he made a mistake. Sanders said he has "short-term memory loss" and "can't be certain if it did or did not happen." When asked if he possibly regretted doing anything like that and wanted to forget, Sanders said "[i]t might've happened like that. Yeah."

Sanders discussed video games, his parents, personal trauma, a medical condition he suffers, and that his younger sister is the person he always tells the truth to. He denied taking any "psychological medications."

Detective Flores returned the discussion to D.V., repeating "this is where you tell me the truth, man." "[P]icture, like, if you're . . . talkin' to [your younger sister] right now [¶] . . . [¶] this is where you . . . pretty much, you know, you apologize and you just admit what you did wrong. It was

6

mainly a mistake. Just tell me the truth, you know? . . . 'Cause [your family is] gonna see this and be, like, well, wait a minute, she's saying this and then you're saying this . . . you don't wanna come in [*sic*], that close relationship come in between you and your little sister, man.  Like, you need to tell me exactly what happened and be honest."  Sanders answered that he was being honest.  The detective asked, "Tell me about [D.V.]" and Sanders stated: "Well . . . as I said, . . . there may be [*sic*] have been things that I've done that I've probably forgotten."  He recalled laying on his father's bed listening to music when D.V. sat next to him.  And after that, his "vision feels a little fuzzy, so it may have happened right there at some point . . . ."  He explained they were pushing each other, his hands were flying around, and ". . . it may have gotten to the point where [he] might have . . . put [his] hands in a place where [he] shouldn't have [¶] . . . [¶] in the general direction of her crotch." When asked if there was a possibility, he put his hands underneath her shorts, Sanders said, "slip ups and things like that may or may not have happened [¶] . . . [¶] [i]t's a bit fuzzy . . . Though, if it did, I would have said sorry . . . because touching a woman like that, or touching a kid like that in this case [¶] . . . [¶] [is] very [¶] . . . [¶] no-no . . . ."  The detective said he was there to "find out the truth and this is the only chance you're probably gonna get to, you know [¶] . . . [¶] [say] sorry to [D.V.]"  It is a way "that guilty conscience [] doesn't eat you alive, man."  Sanders claimed, "it has been . . . eating my very conscience about a lot of things . . ." and he agreed that this was one less thing to worry about "until they told me that [¶] . . . [¶] I was being charged with [¶] . . . [¶] this type of thing."  Sanders said he "broke down" after hearing the charges.  He never thought such a thing would happen to him.

Detective Flores asked if it had been a mistake or if D.V. had flirted with him. Sanders said, "in my case, it definitely might've been a mistake. It was not intentional." And when asked how many times he "made a mistake" with D.V., he replied that "other than that case . . . maybe a [*sic*] the pool, but . . . there were just two incidences, I guess, but that's about it is all I can remember."

Continuing, the detective told Sanders that D.V. reported being rubbed on her vagina for approximately three minutes, which Sanders denied. When asked if it could have been for a shorter time and by mistake, Sanders said his hand "might've slipped down her shorts when . . . we were doing stuff, but it might be for like about 1, maybe 3 seconds." He didn't think his hand "actually went on her vagina" but there was "[a] . . . possibility that it might've gone . . . inside of her shorts" above her crotch area. Then, he said, "in retrospect . . . my hand went in, in there because of things happening. It . . . went in there, and, but it did, my fingers did not go inside of her vagina." "[I]t may have just brushed . . . against it [¶] . . . [¶] underneath the [¶] . . . [¶] panties, I think." He acknowledged that his hand slipped and there may have been a possibility he touched D.V.'s vagina.

The detective thanked Sanders for being honest, saying, "[y]ou're doing a good job, man." Sanders said, "it hurts when I lie, and I know when I feel like I might be about to lie, so I try to catch myself . . . ." Detective Flores said he could tell when Sanders told him, "more of the truth," that he didn't want Sanders living with a guilty conscience, and that his sister would want him to "say the truth."

Sanders recalled watching the *Lucky Star* anime show but did not remember putting his hand down D.V.'s pants because his mind "blanks out here and there." Detective Flores disclosed that D.V. had claimed that

Sanders once asked her if she wanted to touch his penis. The detective suggested, "Maybe you were experimenting . . . Maybe you wanted to know what it felt like[?]" Sanders responded he was "pretty sure [D.V.] didn't say anything like that." When the detective asked if maybe he "wanted to feel what it felt like, maybe, you know, a girl to touch . . ." Sanders denied it at first, then said it was a possibility, but he was not sure.

Sanders remembered swimming in the pool with D.V. twice, and one of those times his aunt (D.V.'s mother) was with them. The other time, he said there was a possibility his hands grabbed or touched D.V. accidentally because of his vision, his "blind sight," or because of D.V. passing by him. He denied trying to put his hands down her pants a few days after they swam in the pool and did not remember ever telling D.V. not to say anything so he would not get in trouble.

Detective Flores repeated that this was "the only opportunity [he would] get to apologize to [D.V.]" Sanders said, "I want to" and claimed he did not want to "keep this on my heart." The detective referenced Sanders's own trauma and stated, "this was traumatic for [D.V.]." Sanders replied, "then I shall say sorry to [D.V. and her mom]." He continued, "I'm pretty sure that my aunt is very upset about what has transpired . . . ." The detective told Sanders to "just tell me what exactly . . . what happened, what did you do . . . ." Sanders said, "I mean . . . we have messed around and stuff happened [¶] . . . [¶] like . . . play fighting and stuff like that [¶] . . . [¶] where I would tickle torture her [¶] . . . [¶] but never to try and do stuff like that, you know?" Sanders didn't believe he touched D.V. underneath her shorts, but if it happened, he wasn't watching. She may have noticed but not him.

Sanders then brought up a past sexual history with another person he had kept secret from others except his family.

9

Concluding the interview, the detective asked if there was anything else Sanders wanted to say to D.V.  Sanders said, "Other than I just apologize that whatever happened[,] I really do apologize because again I was not in my right mind.  Things[] weren't clear to me at the time because I had no handle on my life."  Sanders told the detective he had been completely honest with him.

### 4. *Testimony of the Victim's Mother*

The victim's mother, C.V., testified that her nephew Sanders stayed with her parents in the house next door during the summer of 2013.  During a family barbecue, she saw her daughter in the pool with Sanders.  As Sanders held D.V. with his right arm around her front, D.V. struggled and pushed his arms to get away from him saying, " 'No, no. Let me go.' "  C.V. had never heard her daughter cry out like that before.  She told Sanders to let her daughter go and go home; she told D.V. to get out of the pool and to go into the house.  At that time, C.V. did not find out what had led to that incident.

The following day, C.V.'s mother called to report that "something was going on with [Sanders], that he was leaving, and she didn't know why."  C.V. went to her mother's house to try to "figure it out," but they never were able to determine why Sanders was leaving.

In 2016, D.V. revealed that Sanders had touched her.  D.V. was vague and did not describe the conduct specifically.  C.V. did not report it because she didn't know everything that happened and her daughter "shut down."  She did not know whether she had enough information to contact the authorities.  Also, C.V. did not recall the disclosure occurring as they watched a television program.

The next time the subject of touching came up was in 2020. D.V. started having trouble in school. After reading D.V.'s diary, the mother was concerned her daughter was "very depressed." The diary did not mention D.V. experiencing abuse. But when C.V. talked with her daughter, D.V. disclosed that Sanders "was abusing her whenever she was there at her grandparents' house. Whenever he could find her alone."

5. *Defense Witness Testimony*

The sole defense witness was Sanders's sister, Rachell.[5] She is seven years older than Sanders and grew up in the same household as him.

Early in her testimony, the People objected when counsel asked her to describe Sanders's home life. The court requested an offer of proof concerning the proposed testimony. Counsel referenced the recorded interrogation and said he expected Rachell to testify that Sanders grew up in a traumatic and emotionally abusive household, that he was not well socialized, and that these circumstances affected the way he tends to express himself. This information was relevant to the custodial interrogation because Sanders has a tendency to make statements that are aimed at pleasing people and giving them what he expects they want to hear. The court told counsel that Rachell could testify as to Sanders's relevant character but did not believe she would be able to testify "*why* his character is the way it is" unless she had some specialized knowledge. (Italics added.)

Rachell's testimony resumed and established that, in her opinion, Sanders is an honest person. When asked if she had "ever known [Sanders] to make false statements about things that have occurred[,]" she said, "[n]o."

---

[5] Rachell shares the same surname as the defendant. For clarity, we refer to Rachell by her first name only. No disrespect is intended.

11

### B. The Motion to Exclude or Strike Involuntary Statements

Sanders filed a motion in limine seeking exclusion of "any out of court statement made by Mr. Sanders . . . [to] law enforcement, with or without *Miranda* warning or detention." The motion claimed the circumstances of the interrogation cast doubt upon the reliability of Sanders's statements.

During the testimony of Detective Flores, defense counsel objected to the admission of the recording of Sanders's interview based on "the voluntary nature of the statements being obtained." Counsel told the court that before any ruling on the motion, he wanted to question the detective on that subject. The court received the recording into evidence subject to a motion to strike and allowed defense counsel the opportunity to cross-examine the detective about Sanders's statements and present evidence bearing on the question later during the proceedings.

After the close of evidence, the court asked about the pending motion. Defense counsel requested a moment to review "[his] authority" and then informed the court, ". . . at this time, . . . in light of the Court's ruling on, essentially, the motion under 1108 to strike the matter I thought was irrelevant and in light of the evidence, I'm going to withdraw the motion to strike the statement."

Next, the parties presented closing arguments. Each focused on D.V.'s credibility. The People argued her testimony stood up to cross-examination and was corroborated by her mother and by the statements Sanders made to the detective. The defense identified inconsistencies between D.V. and statements by her mother and Sanders which demonstrated "some sort of contact" between Sanders and D.V. but contact "not rising to the level of what was charged in the Information . . . ." Counsel maintained that at some point D.V. perhaps retrospectively viewed this contact as "inappropriate,"

"offensive" or "a bad thing" and "in the years that have followed and in the challenges that she has occurred . . . she has put a name and a face to her troubles."

The People's rebuttal argument largely relied on the recorded interrogation. It contended that Sanders's statements concerning how he touched D.V., that he wanted to apologize, and his explanation that he was not in his right state of mind, all show guilt.

### C. Verdict and Sentence

In explaining its verdict, the trial court examined D.V.'s credibility and whether it could rely on her memory given her young age at the time of the offenses and the time that had since passed. The court gave little weight to the testimonies of C.V. and Rachell but found D.V. credible for multiple reasons. She "had no motive to lie. There was no[] evidence of any animosity or dispute between Defendant and D.V. for any of her family members." Her testimony was consistent and the abuse she described was "anchored to some specific and unique details" including D.V. wanting to share a YouTube video with Sanders or the grandmother walking by and almost catching Sanders in the act. D.V.'s demeanor and behavior while testifying likewise provided some indication that D.V. experienced these events. The court also found that the sequence of events supported D.V.'s credibility. The chronological order "align[ed] perfectly" with Sanders's escalating conduct and D.V.'s increased resistance to his behavior—evidence that was "even more compelling . . . than the defendant's statement . . . ."

Turning to the recorded interview, the court commented that Sanders had not been coerced or tricked into making statements to Detective Flores. Although he made no confessions, the statements supported D.V.'s credibility in the sense that his attempts to minimize his conduct demonstrated a

13

consciousness of guilt.  After carefully weighing the evidence, the court found the testimony of D.V. to be "credible in all aspects" and that the events happened as she described.

Sanders was found guilty of six felony offenses and sentenced to 16 years in the state prison.[6]

## II.  DISCUSSION

The sole contention on appeal is that Sanders's trial attorney provided ineffective assistance by withdrawing the motion to exclude his statements to Detective Flores on the ground they were involuntary.

### A. Ineffective Assistance of Counsel

The constitutional right to counsel "include[s] the right to *effective* legal assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*); U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)  To establish ineffective assistance, Sanders must show his counsel's representation "fell below an objective standard of reasonableness under prevailing professional norms, and that he was prejudiced, i.e., that it is reasonably probable the result would have been more favorable had counsel acted competently." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 489; *Strickland v. Washington* (1984) 466 U.S. 668, 694.)  " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no

---

[6] The offenses included violations of section 288, subdivision (a) (counts one through four), and section 289, subdivision (a)(1)(B) (count six).  Sanders was found not guilty of attempted forcible lewd act upon D.V. as alleged in count five but was found guilty of the lesser offense of attempted lewd act upon a child.  (§§ 664/288, subd. (a).)  The charged aggravating circumstances were also found true.

14

rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai, supra,* 57 Cal.4th at p. 1009.) We "defer[] to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance."[7] (*Ibid*.) Furthermore, in order to show prejudice resulting from "a trial attorney's failure to make a motion or objection," Sanders "must demonstrate . . . that the motion or objection would have been meritorious . . ." (*People v. Mattson* (1990) 50 Cal.3d 826, 876), and, a reasonable probability the verdict would have been different if the motion had been granted. (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 375 [federal habeas corpus petitioner must show his motion had merit and a reasonable probability the verdict would have been different had he prevailed].)

In this case, after trial witnesses had testified and the recorded interview was played, defense counsel explained his decision to abandon the motion. First, he recalled that the court had already excluded a portion of the recorded interview involving other bad acts, or "1108 evidence," he wanted excluded. Second, the attorney reviewed his authority for the motion and said, "[I]n light of the evidence, I'm going to withdraw the motion to strike the statement." Thus, as we know why counsel dropped the motion, our review concentrates on whether there was a "rational tactical purpose"

---

[7] In this area, courts often caution against second-guessing trial counsel's "reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) If, for example, defense counsel reasonably could have determined that a motion to suppress would have failed, his performance will not be found deficient on appeal. (*Sexton v. Beaudreaux* (2018) 585 U.S. 961, 965.)

behind the decision.  (*Mai, supra,* 57 Cal.4th at p. 1009.)  To make this assessment, we consider the law of involuntary confessions.

### B. Involuntariness

Sanders acknowledges he was advised of his *Miranda* rights before answering the detective's questions.  His claim of involuntariness rests on the allegedly coercive nature of the detective's interviewing techniques that followed.

Involuntary statements obtained by law enforcement cannot be admitted at trial.  (*People v. Neal* (2003) 31 Cal.4th 63, 79.)  The test for voluntariness is whether the statement is " ' "the product of an essentially free and unconstrained choice" ' " or whether the defendant's " ' "will has been overborne and his capacity for self-determination critically impaired" ' " by coercion.  (*People v. Cunningham* (2015) 61 Cal.4th 609, 642; *Mincey v. Arizona* (1978) 437 U.S. 385, 398 [a statement is involuntary where it is not " ' "the product of a rational intellect and a free will" ' "].)  Voluntariness "does not turn on any one fact, . . . but rather on the 'totality of [the] circumstances.' "  (*People v. Neal, supra,* 31 Cal.4th at p. 79.)  The prosecution must prove the voluntariness of a confession by a preponderance of the evidence.  (*In re Elias V.* (2015) 237 Cal.App.4th 568, 577 (*Elias V.*).)  Relevant concerns include police coercion, the location and length of interrogation, its continuity, and the defendant's maturity, education, mental health, and physical condition.  (*People v. Cunningham, supra,* 61 Cal.4th at pp. 642–643; *Withrow v. Williams* (1993) 507 U.S. 680, 693.)  Although not determinative of voluntariness, it has been observed that compliance with *Miranda* rarely results in the exclusion of self-incriminating statements.  (*Berkemer v. McCarty* (1984) 468 U.S. 420, 433, fn. 20; *Missouri v. Seibert* (2004) 542 U.S. 600, 608–609 ["giving the warnings and getting a waiver has

16

generally produced a virtual ticket of admissibility"].)  On appeal, we apply an independent standard of review.  (*People v. Stayner* (2026) 19 Cal.5th 395, 436 (*Stayner*).)

### C. Withdrawal of the Motion

Sanders maintains "no conceivable tactical reason exist[ed] for defense counsel's withdrawal of his objection to the admission of [his] statements that he possibly touched D.V. as she had claimed."  He acknowledges he was advised of his *Miranda* rights, and the detective did not subject him to threats, violence, or improper promises.  (*People v. Wall* (2017) 3 Cal.5th 1048, 1066.)  Sanders claims his motion was meritorious because Detective Flores isolated him in an interview room, pretended to be a " 'false friend[,]' " exploited his mental and physical vulnerabilities, and used coercive interrogation techniques to overcome his will.[8]

Our state supreme court recently addressed whether psychological techniques employed by law enforcement during questioning overstepped the

---

[8] As referenced by Sanders, the term " 'false friend' " refers to a tactic shown in a law enforcement treatise on interrogation colloquially known as the "Reid training manual."  The tactic involves an officer misleading a "suspect into believing the officer is protecting the suspect's best interests." (*People v. Caro* (2019) 7 Cal.5th 463, 531 (conc. opn. of Liu, J.).)  In addition to recommending that interviewees be isolated for questioning, the Reid manual teaches "maximization" and "minimization," a " 'cluster of tactics' " designed to (1) convey " 'the interrogator's rock-solid belief that the suspect is guilty and that all denials will fail' " (maximization) and (2) to provide the suspect with " 'moral justification and face-saving excuses for having committed the crime in question' " (minimization), "a tactic that 'communicates by implication that leniency in punishment is forthcoming upon confession.' " (*Elias V.*, *supra*, 237 Cal.App.4th at p. 583.)  During trial, neither party raised or argued the Reid training manual and its principles. Neither side questioned the detective about the interviewing techniques he employed and why.

17

boundaries of due process to induce an involuntary confession. (*Stayner*, *supra*, 19 Cal.5th at p. 438.)  In *Stayner*, as with the interview of Sanders, an officer presented himself as "an ally" to the defendant and repeatedly encouraged him to confess to the details of his murders as "the right thing to do" to bring closure to himself and his victims.  (*Id.* at pp. 437–438.)  The officer minimized Stayner's acts, telling him he was a "good person" who was " 'troubled' " and had been "made to do bad things by 'things happening in you that you can't control,' " and that by confessing, he would be " 'doing the hardest, bravest thing in [his] life.' " (*Id.* at p. 437.)  Rejecting Stayner's claim that the techniques used to lure him into confessing were so overbearing that his confession could not be considered voluntary, the court observed that "[u]rging a witness to confess by winning the witness's trust and appealing to the witness's sense of morality are not practices likely to produce an involuntary and unreliable confession. Nor are investigators prohibited from expressing compassion for someone they are interrogating . . . ." (*Ibid.*)  They may seek rapport with and remind their subjects "of the emotional and psychological benefits of confessing." (*Ibid.*; *People v. Williams* (2010) 49 Cal.4th 405, 447 (*Williams*) [It is not "inherently coercive for an interrogator to attempt to form rapport with the suspect"].)

Sanders argues his lack of sophistication, maturity, and experience with the criminal justice system rendered him vulnerable to police interrogation techniques.  At the time he spoke to the detective, he was nervous and wore padded green clothing the detective recognized as the kind worn by inmates who were possibly "suicidal or want[ed] to hurt themselves." These characteristics, he argues, were no match for the detective's interviewing techniques which took "advantage of [his] lack of life experience and fragile mental state . . . ."  Trial evidence, however, did not bear out these

18

conclusions.  The filmed interrogation did not corroborate these assertions.  No expert testimony was presented on the issue of Sanders's claimed psychological vulnerabilities.  The detective was not questioned about the extent to which, if at all, he recognized and sought to exploit such vulnerabilities.  Additionally, one attempt to lay a foundation for this argument missed its mark.  Defense counsel tendered an offer of proof that he expected Rachell to testify about Sanders's upbringing and character to support the argument that Sanders tends to make "statements that are aimed at pleasing people" and giving them what "he expects they want to hear."  However, when Rachell was asked whether she knew her brother "to make false statements about things that have occurred," she replied, "no."  She described Sanders as "an honest person."

Sanders likens his case to one considered by our colleagues in Division Two which discussed Reid training manual techniques to find the interrogation of a 13-year-old boy produced involuntary statements.  (*Elias V.*, *supra*, 237 Cal.App.4th at p. 571.)  There, the minor had been isolated and aggressively interviewed about inappropriately touching a three-year-old child.  Investigators made up evidence against him, suggested they could force him to take a polygraph test, and presented him with a forced-choice question (whether he inappropriately touched the victim because he " 'found it exciting' " or " 'out of curiosity' "), a strategy with no innocent answer "that can easily induce an adolescent . . . to falsely incriminate himself when confronted with false evidence of his guilt."  (*Id*. at pp. 586, 589.)  The court recognized that this manner of interrogation was "unjustified even by the standards of the Reid Technique itself."  (*Id*. at p. 599.)  Moreover, there was no evidence about the crime that would allow the minor's statements to be

19

confirmed as truthful, and other evidence suggested his admissions were false. (*Id.* at p. 596.)

*Elias V.* bears little factual resemblance to the exchange between Detective Flores and Sanders. Sanders was 27 years old at the interview. He was not subjected to a similar degree of aggressive, deceptive, or false choice questions. Although he commented that his heart was beating fast, Sanders did not appear intimated by the officer and repeatedly denied intentional sexual contact with D.V., a sign that his will had not been overborne. (*Williams, supra,* 49 Cal.4th at p. 442 ["defendant did not incriminate himself in response to the interrogation, indicating the effective functioning of his will remained intact."].) On appeal, he suggests he operated at a maturity level below his biological age. But he points to no portion of the record illustrating how such immaturity adversely impacted him during the interview. Lastly, unlike the statements in *Elias V.*, Sanders's statements were corroborated by D.V.'s detailed testimony. [9]

" 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' " (*Stayner, supra,* 19 Cal.5th at p. 438.) Such coercion is not present in this case. Here, it is difficult to understand how Sanders's will was overborne by the detective's

---

[9] Sanders asserts that by questioning him about D.V.'s specific claims, the interrogation suffered from " 'contamination,' " a suggestive technique that increased the chance his statements resulted from his suggestibility rather than a recall of actual events. In *Elias V.*, contamination contributed to the finding of involuntariness because the minor had been led by suggestions that had no evidentiary basis. Because the investigator had no information about the alleged offense, she had no basis against which to evaluate the veracity of Elias's statements. (*Elias V., supra,* 237 Cal.App.4th at p. 593.) Here, we see no similar concern with the detective's use of D.V.'s account to give Sanders the opportunity to validate or refute it.

questioning. Sanders knew he had been accused of pedophilia when they met. He understood his *Miranda* rights. The conversation that followed lasted for 65 minutes and never assumed a confrontational tone. The detective did not use deception, threats, or promises to elicit responses. Also, the repeated urging for Sanders to tell the truth did not improperly induce answers. (See *In re Joe R.* (1980) 27 Cal.3d 496, 515 [mere " 'advice or exhortation by police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary' "].) At times, Sanders led the conversation, redirecting it to discuss video games, his family members, and his own history.

Sanders believes his attorney's deficient performance is illustrated by the fact that, despite withdrawing the motion, the attorney nonetheless argued that "the interrogation was involuntary and the court should not rely on it." But this mischaracterizes counsel's closing statement. Involuntariness was not argued. Counsel expressed the opposite, conceding his client's interview probably did "not rise to the level of a . . . coercive type of situation." He instead argued against the credibility of D.V.'s memory, suggesting that reasonable doubt existed in a view of the evidence that some sort of contact between Sanders and D.V. occurred in 2013 that made D.V. feel uncomfortable, but did not amount to the criminal conduct charged against him. Defense counsel alleged that, in the many years since 2013, combined with personal challenges D.V. faced, Sanders became the "name and [] face to her troubles." In this light, counsel urged an understanding of his client's statement that—although Sanders repeatedly acknowledged that "something might have accidentally happened"—he never "really [came] right out and [said], oh, yeah, well, you know, I did those things." Counsel's

argument thus explained the evidence in a manner consistent with a belief in the voluntariness of Sanders's inculpatory statements.

Sanders further claims that to the extent his attorney's decision to forgo the motion was strategic, it was unreasonable. Again, we cannot agree. Counsel requested and was provided the opportunity to question the detective about his client's statement during trial. After the videotaped interrogation was played in court, counsel examined the detective about Sanders's demeanor and the padded garment he wore during the interview. On this record, we cannot conclude the decision to abandon the motion was not a reasonable tactical decision. By the time the withdrawal decision was made, the court had already ruled in Sanders's favor to exclude the portion of his statement involving uncharged "other bad acts." Trial counsel had seen all of the trial evidence and could make his own assessments of it. Armed with this real-time knowledge, counsel determined the motion lacked merit, a decision with which we agree.[10] (*Sexton v. Beaudreaux, supra,* 585 U.S. at p. 965 [If defense "counsel reasonably could have determined that [a] motion to suppress would have failed[,]" his performance will not be found deficient on appeal].)

In sum, because we conclude the totality of the circumstances did not show Sanders's statements were involuntary, we do not find his counsel's performance deficient for withdrawing the motion to suppress those statements. Accordingly, we conclude that Sanders was not deprived of effective assistance of counsel, and we need not reach the question whether admission of the statements was also prejudicial.

---

[10] The trial court appears to have also agreed. When discussing its credibility determinations that led to the verdict, it remarked that Sanders had not "in any way" been "coerced or tricked into making these statements."

# III.  DISPOSITION

The judgment is affirmed.

_____
SMILEY, J.

WE CONCUR:


_____

BANKE, Acting P.J.


_____

LANGHORNE WILSON, J.

_People v. Sanders_ / A170791

24